* J.
 

 The defendant was convicted of _ # ^ a murder, in the New York oyer and terminer, *- and sentenced to be hanged on the 21st day of November 1851. At his trial, a bill of exceptions was taken and the case was carried by writ of error to the supreme court, where, in May term 1852, the judgment was reversed and a new trial ordered. Upon this judgment of reversal, a writ of error has been brought in the name of the people to this court; and we are moved to dismiss the writ, upon several grounds.
 

 *The first ground is, that by the record the ^ ^ judgment of reversal appears to have been rendered on the first Monday of February 1852, while the act under which the writ of error must be sustained, if sustained at all, was not passed until the 22d March 1852; and that, according to the rule established in
 
 People
 
 v.
 
 Carnal
 
 (6 N. Y. 463), the statute in question does not sustain a writ of error upon a judgment rendered before its passage. It appears, however, outside of the record, by affidavits, that the judgment was, in point of fact, rendered in May term, and after the passage of the act. We entertain no doubt whatever, that upon a question of this sort, we are entirely at liberty and are.bound to look out of the record, to ascertain the true time when
 
 *390
 
 the judgment was rendered. Upon this ground, we ought not to dismiss the writ.
 

 It is also contended, that the judgment of reversal in this case does not come within the description contained in the act, of those judgments which are to be reviewed according to its provisions. The act says: “ any judgment rendered in favor of any defendant, upon any indictment for any criminal offence (except where such defendant shall have been acquitted by a jury), may be reviewed on writ of error on behalf of the people, and the court of appeals shall have full power to review by writ of error, in behalf of the people, any such judgment rendered in the supreme court, in favor of any defendant charged with a criminal offence.” That the terms
 
 “
 
 upon any indictment,” do not limit the description to judgments not upon verdict is obvious, from the exception which immediately follows, and which would be wholly unnecessary, unless- the preceding words of description were broad enough to cover judgments upon verdicts as well as upon demurrer. The clause is, therefore, to be construed as including all judgments in favor of defendants charged with crime, except where an acquittal by a jury has occurred. This brings the case in hand directly within the provision authorizing a review in this court of any judgment rendered by the supreme court, in favor of a defendant charged with crime, unless indeed, in this particular case, to subject the judgment below to this act, would be to give it a retrospective effect. As, however, the *act was passed before -* the rendition of the judgment appealed from, it does not need to be construed retrospectively, in order to bring this case within its provisions.
 

 This case is, therefore, rightly before us for examination upon the merits. If the supreme court has erred in reversing the judgment of the oyer and terminer, then it is our duty to pronounce judgment against the defendant. Tho principle question involved in the case arises
 
 *391
 
 upon the charge of the judge, who instructed the jury,. that if the killing was produced by the prisoner with an intention to kill, though that intention was formed at the moment of striking the fatal blow, it was murder; and that the jury might infer such intention from the circumstances of the case, and, among other things, from the nature of the weapon and the wounds given by it.
 

 There was nothing in the facts of this case which made it necessary for the court to lay down the law in relation to homicide upon provocation. So far as the prisoner and the deceased were concerned, the deceased does not appear to have made any assault upon him, nor to have interfered with him in any way. The material, facts are, merely, that while the deceased was standing on the sidewalk, the prisoner came up and struck him on the head a violent blow, with a heavy cartrung, of the length of about four feet and of the thickness of a man’s arm; that the deceased immediately fell, with his head towards the street, partially over the curbstone; that the prisoner having, for a short interval, left the deceased, returned, and struck him, while lying on the sidewalk, three blows on the head with the same cartrung. Of one of the blows, the deceased died, the skull having been fractured at the back of the head.
 
 [1]
 

 The revised statutes (2 R. S. 656-7, §§ 4, 5) declare “the killing of a human being, without the authority of law (unless it be manslaughter or excusable or justifiable homicide, as thereinafter defined), to be murder, when perpetrated from a premeditated design to effect the death of the person killed or of any human beingand in some other cases which are not material to be stated
 
 *392
 
 * 392 1 ^°r °Ur Presen* PurPose.- That the homicide *in -* this case was neither justifiable nor excusable is conceded.
 

 Manslaughter in the first degree, except by aiding one to commit suicide, or by killing an unborn and quick child by an injury to the mother, must be committed without a design to effect death. The same absence of a design to effect death belongs to manslaughter in the second and third degrees, except in certain cases named in the statute, and which have no resemblance to the case in hand. Manslaughter in the fourth degree includes all killing, not justifiable or excusable, and not amounting to murder or manslaughter as before defined.
 

 The fact of which the prisoner has been found guilty, either amounts to murder, as defined by the first clause of the statute, or it is only manslaughter in the fourth degree. The degree of criminality inherent in the act is plainly greater than belongs to several of the higher degrees of manslaughter; for the prisoner intended to kill, which intention, as we have seen, does not generally exist in any grade of manslaughter higher than the fourth degree. We cannot suppose, that the legislature intended to make an act of so heinous a nature only manslaughter in the fourth deegree. If that is the legal grade of the offence, it must be attributed to an over-' sight on the part of the legislature, growing out of the difficulty of adapting new terms to the expression of legal distinctions. Still, whether such an oversight has occurred, can only be determined by a careful examination of the statute.
 

 The section defining" murder (2 R. S. 657, § 5) varies from that reported by the revisers, only in this, that it omits a sub-section which included in the enumerated species of murder, homicide perpetrated from a premeditated design to do some great bodily injury, although without a design to effect death. Upon the section as reported, the revisers say, “there is no departure from the present law, except in the case of implied malice arising from being engaged in an unlawful act, as in a riot. If such death was designed, or bodily harm was intended, or the object of the riot was a felony, it would be included in the proposed section. The great principle on which the section rests is this, that to constitute murder, there should be an express ^design to take life, or such circumstances as to induce a *- very strong presumption of such a design, or such facts occurring in a transaction as would ordinarily lead to the result of taking life.”
 

 In the case before us, the question is not whether a design to take life existed; that has been found by the jury. When the prisoner struck the blow, he intended to kill, so that we are not called upon to inquire what other design or purpose, if any, will suffice to constitute the crime of murder. The question here is — an intention to kill existing at the instant of striking the fatal blow, is such an intention a premeditated design, within the meaning of the statute ? The words premeditated, aforethought and prepense, possess etymologically the same meaning; they are, in truth, the Latin and Saxon synonymes, expressing a single idea, and possess in law precisely the same force; the statute, so far as this term is concerned, has not altered the law. Malice prepense, however, had attained a broader meaning than belongs to the term premeditated design; the intent to take life was not necessary to constitute malice prepense. Even express malice, or malice in fact, is defined to be a deliberate intention of doing
 
 any
 
 bodily harm to another, unauthorized by law (Hale’s P. C. 451), and by no means necessarily involved an intent to take life. The change, therefore, which the statute has effected, by substituting the word design in place of malice, is not to alter the nature or degree of the premeditation requisite to the crime of murder, but to require (what the common law
 
 *393
 
 did not require) the existence of an actual intention to kill, to constitute that crime under the first subdivision of the 5th section.
 

 This view of the law is well sustained by the decisions in those states where the crime of murder has been distinguished by statute into murder in the first and second degrees. In those states wilful, deliberate and premeditated killing is murder in the first degree. The cases are very ably reviewed in Wharton’s Am. Crim. Law (2d ed., pp. 420
 
 et seq.),
 
 and the clear result of them is, that in cases of deliberate homicide, where there is a specific intention to take life, the offence, if consummated, is murder in the first degree. The degree of * 394 1 liberation is not different from that *required by the common law. As was said by Chief Justice M’Kean, in
 
 Respublica
 
 v.
 
 Bob
 
 (4 Dall. 145),
 
 “
 
 the intention remains as much as ever the true criterion of crime, in law as well as in ethics. Let it be supposed, that a man, without uttering a word, should strike another on the head with an axe, it must, on every principle by which we can judge of human actions, be deemed a premeditated violence.” If there be sufficient deliberation to form a design to take life, and to put that design into execution, by destroying life, there is sufficient deliberation to constitute murder, no matter whether the design be formed at the instant of striking the fatal blow, or whether it be contemplated for months. It is enough, that the intention precedes the act, although that follows instantly. The law has no favor to extend either to the rapid or the slow execution of such a design.
 
 [2]
 

 
 *394
 
 In the case- before us, there was no provocation, no mutual combat, no heat of passion which the law can recognise; for outbursts of ungovernable passion do not excuse a man for any acts of atrocity he may commit under their influence. Men are bound to control their passions, and if they suffer them to run away with their reason and senses, they ought to suffer for it.
 
 (State
 
 v.
 
 Spencer,
 
 1 Rob. 206.) We cannot discern a single circumstance, which tends in any degree to soften one feature of the atrocity of the defendant’s crime. Intending to take his victim’s life, the defendant beat him upon the head with a deadly weapon, until his design was accomplished. This crime is, by our laws, murder, and we are well satisfied, not only that this is the law, but that it could not be relaxed, so as to exclude such cases as the present, without substantially diminishing the security of human life.
 

 None of the cases in this state conflict at all with the law as before stated.
 
 People
 
 v.
 
 Enoch,
 
 13 Wend. 159, only holds that the common-law form of indictment is sufficient under the new statutory definition of murder, and neither
 
 People
 
 v.
 
 Rector, People
 
 v.
 
 White,
 
 nor
 
 People
 
 v.
 
 Shorter
 
 have any bearing upon the case. The judgment of the supreme court is erroneous, and must be reversed, and the judgment of the New York oyer and.terminer *must be affirmed, and as the day of execution ^ is past, the proceedings must be remitted to the *- supreme court to pronounce sentence anew against tha prisoner.
 
 [3]
 

 Judgment reversed.
 

 [1]
 

 The inference of an intent to kill, may be drawn from the use of a deadly weapon, and the manner in which it is used. People
 
 v.
 
 Rogers, 13 Abb. Pr. (N. S.) 370 ; People
 
 v.
 
 Batting, 49 How. Pr. 392 ; Thomas
 
 v.
 
 People, 67 N. Y. 218 ; Kilpatrick
 
 v.
 
 Commonwealth, 31 Penn. St. 198 ; Commonwealth
 
 v.
 
 Drum, 58 Ibid. 9 ; McCue
 
 v.
 
 Commonwealth, 78 Ibid. 185 ; Lanahan
 
 v.
 
 Commonwealth, 84 Ibid. 80.
 

 [2]
 

 To the same effect, see People v. Sullivan,
 
 infra
 
 396 ; Walters
 
 v.
 
 People, 6 Park. 15 ; O’Brien v. People, 48 Barb. 274 ; Lanergan
 
 v.
 
 People, 50 Ibid. 266 ; People v. Austin, 1 Park. 154 ; People
 
 v.
 
 Shay, 4 Ibid. 344 ; Dolan
 
 v.
 
 People, 6 Hun 493 ; s. c. 64 N. Y. 485 ; People
 
 v.
 
 Waltz, 50 How. Pr. 204.
 

 [3]
 

 Eor the subsequent proceedings in the supreme court, on motion for s Warrant of execution, see 1 Park. 360.